UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 21-cr-585 (CRC) |
| v. : | |
| : | |
| JAMES DOUGLAS RAHM, III, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant James Douglas Rahm, III to four months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Defendant James Douglas Rahm, III, a 29-year old disc jockey from Atlantic City, New Jersey, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Rahm pleaded guilty to a violation of 18 U.S.C. § 1752(a)(2). The government's recommendation is supported by the defendant's having (1) approached the Capitol building in the afternoon of January 6 despite observing and recording video on his Go-Pro of at least one injured police officer, hearing at least one flashbang grenade explode, and detecting tear gas; (2) spent more than 45 minutes inside the Capitol building during the riot; (3) joined the crowd that surged past police officers trying to hold back the rioters in the Crypt; (4) joined another crowd inside the Capitol at the East Rotunda Doors that collectively pushed three police officers out of the way and opened the East Rotunda Doors, allowing hundreds of rioters to stream into the Capitol; (5) entered and filmed a sensitive space – Speaker Nancy Pelosi's Office Suite; and (6) appeared to smoke marijuana in the Rotunda.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Rahm's crime support a sentence of four months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution in this case.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 52, the Statement of Offense.

*Defendant Rahm's Role in the January 6, 2021 Attack on the Capitol*

Rahm travelled to Washington, D.C. from his home in Atlantic City, New Jersey with his father, James Douglas Rahm, Jr., to attend the rally for then-President Trump at the Ellipse. Prior

to the conclusion of the rally at the Ellipse, Rahm and his father walked to the Capitol because they thought another rally would take place there.  At the Capitol, the pair separated, and Rahm went to the west side of the Capitol while his father remained on the east side.

Rahm joined the crowd on the West Lawn of the U.S. Capitol grounds, near the Northwest Scaffolding that had been erected over a set of stairs leading up to the Capitol building.  There, Rahm took video on his Go-Pro camera of a visibly injured police officer being helped by other officers.  Rahm joined the mob storming the Capitol and ascended the stairs himself.  Undeterred by the violence on the West Plaza, Rahm went up to the Upper West Terrace.  From this vantage point, Rahm took videos on his Go-Pro of the action.  In one video Rahm recorded on the Upper West Terrace, he said, "Holy shit, holy shit. Oh, my fucking God. We just stormed the Capitol. Holy Fuck."

Again, Rahm pushed ahead.  He entered the building through the Senate Wing Door, which had been violently breached by other rioters less than 15 minutes earlier.  Rahm recorded a video of the shattered glass in the door as he entered.  An alarm was blaring, and rioters were singing the National Anthem.

From the Senate Wing Door, Rahm filmed as he walked to the Crypt while rioters around him chanted, "Whose house? Our house!"  He stopped in a conference room where a rioter near him yelled, "Let's get those dirty politicians!"  In the Crypt, U.S. Capitol Police officers had formed a line in an attempt to block the rioters from advancing further into the building.  But rioters continued streaming into the Crypt, quickly outnumbering the officers and pushing past them.  Though not at the front, Rahm formed part of this critical mass.

Once the crowd overwhelmed Capitol Police in the Crypt, Rahm proceeded into the Small House Rotunda and took stairs up to the Capitol's second level. He recorded a video as he walked through then-Speaker Pelosi's office suite, which was overrun with dozens of rioters.

Rahm spent approximately the next 30 minutes in and around the Rotunda, at one point filming himself appearing to smoke marijuana in the Rotunda, as depicted below:



*Image 1: Screenshot from Snapchat video 437812847 at 0:00*

At approximately 2:38 pm, Rahm was part of a group gathered in the East Rotunda Lobby while a loud alarm blared. At the time, there were three police officers standing between the group in the East Rotunda Lobby and the East Rotunda Doors, keeping them closed as rioters attempted

4

to open the doors from the inside to allow additional rioters into the Capitol. Rahm was part of a group that pushed the police officers into the doors, causing the doors to open, allowing additional rioters into the Capitol:



*Image 2: Screenshot Capitol CCTV at 2:38:13 p.m.*



*Image 3: Zoomed Screenshot from Capitol CCTV at 2:38:23 p.m.*



*Image 5: Screenshot from Rahm's Go-Pro, video GX010293*

Unbeknownst to Rahm, one of the rioters who entered the Capitol through the East Rotunda Doors at this time was his father. Rahm remained in the Rotunda until police cleared it. Rahm exited the Capitol through the East Rotunda Doors at approximately 3:20 p.m., having spent nearly an hour in the Capitol.

*Rahm's Interview with the FBI*

On February 11, 2021, Rahm gave a voluntary interview to the FBI via Zoom. During the interview, he admitted traveling to Washington with his father because he wanted to record footage of the rally on January 6, 2021 that he hoped to later sell to news organizations.

Rahm stated that on the west side of the Capitol, he was "following the action" and went to the bottom of the stairs where there was a police line. Rahm stated a flashbang grenade went off and tear gas filled the air. He stated the crowd began to get "rowdier" and the police line in front of him retreated so he and the crowd advanced up the stairs. Rahm stated he had not seen any violence and saw a police officer handing out water to the crowd, so he felt as though he'd done nothing wrong.

Rahm admitted he entered the U.S. Capitol along with others in the crowd. He stated that he saw the broken windows and tear gas coming out of the Capitol building before he entered. Rahm stated he was in a hexagon-shaped room where a line of police officers was keeping the

crowd back until the people pushed past the police. Rahm stated at this point, he felt he "made the wrong decision going in there." He also told the FBI that he observed violence against police, including a cone thrown at an officer and officers being pepper sprayed and that it "absolutely made me sick."

Rahm stated that while inside the Capitol, he entered Speaker Pelosi's office suite where he heard banging and glass breaking. Rahm told the FBI, "It felt wrong in my heart." Rahm stated he captured footage in and around the U.S. Capitol, to include footage of violence against law enforcement.

Rahm stated he was in a lobby off the Rotunda and was trying to leave the Capitol but there were police officers at the doors trying to prevent people outside from entering the Capitol. Rahm said he shouted, "Go, go, go. The police are trying to move us." He heard someone scream "push" and felt "a push from behind." The doors opened and people came inside.

After he eventually left the U.S. Capitol, Rahm met back up with his father who told him that he too was inside the U.S. Capitol. Rahm identified himself in a photograph from January 6 for the FBI. On February 17, 2021, Rahm voluntarily provided his cellphone and GoPro camera to the FBI. Video footage captured by Rahm found on his GoPro camera catalogued his time in the U.S. Capitol.

*The Charges and Plea Agreement*

On March 16, 2021, the United States charged Rahm by complaint with violating 18 U.S.C. §§ 1512(c)(2), 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 17, 2021, a grand jury in the District of Columbia indicted Rahm on the same four misdemeanor charges and a charge of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). On October 10, 2023, pursuant to a plea agreement, Rahm pleaded guilty to Count Three of the Second

Superseding Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds. By plea agreement, Rahm agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Rahm now faces a sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, a term of supervised release of up to one year and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The U.S. Probation Office calculated the offense level under the Sentencing Guidelines as follows:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| 0 Criminal History Point (U.S.S.G. § 4C1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 6 |

*See* PSR at ¶¶ 30-39.

This calculation includes a new guideline that was added on November 1, 2023, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

The Court should not apply § 4C1.1 here for the reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Further, while Rahm himself did not directly touch a police officer, he joined in the violence, pushing with a mob of other rioters to break through defensive lines that police officers had established.

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-

9

reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[2]

The U.S. Probation Office calculated Rahm's criminal history as category I. PSR at ¶¶ 40-43. The government does not object to that determination. Accordingly, the U.S. Probation Office calculated Rahm's Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 74. Rahm's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation

---

[2] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Office's calculation, with the exception of the application of U.S.S.G. § 4C1.1. But whether or not the Court applies the § 4C1.1 reduction, the Guidelines range is 0-6 months.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of four months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Rahm's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

11

One of the most important factors in Rahm's case is his involvement in the push that allowed the East Rotunda Doors to be breached. While Rahm has maintained that he did not knowingly push in an effort to breach the doors, he was in the middle of the pack when the push happened. Rahm also told the FBI that he was trying to leave the Capitol at the time and got caught up in the push. However, once the doors were opened at 2:38 p.m., Rahm remained in the Capitol for an additional 42 minutes.

Additionally, Rahm's entry into then-Speaker Pelosi's suite is a substantial aggravating factor, particularly because then-Speaker Pelosi's terrified staff were sheltering in one of the offices, hiding under tables and behind furniture.[3]

Rahm also disrespected the Capitol and those who have worked there for centuries by smoking marijuana within its halls.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Rahm's History and Characteristics

As set forth in the PSR, Rahm has a bachelor's degree, no history of substance abuse, no criminal history and was raised in a home free from abuse. ECF No. 54, ¶¶ 65, 62-63, 40-43, 54. He appears to have been compliant with his conditions of pre-trial release. *Id.* at ¶ 13. He runs a successful disc jockey business. *Id.* at ¶ 66. Though Rahm's presence on January 6 may have been influenced by his father, Rahm was 27 years old on January 6, 2021, and was an adult capable of making his own decisions. His lack of criminal history is already specifically encapsulated by the guideline calculation. Additionally, the data which led the Sentencing Commission to enact

---

[3] *See* Peiser, Jaclyn. "Pelosi says staff hid under a table for hours as rioters vandalized her office: 'A terrible, terrible violation.'" *Washington Post,* January 11, 2021. https://www.washingtonpost.com/nation/2021/01/11/pelosi-60-minutes-capitol-impeachment/

U.S.S.G. § 4C1.1 is not predictive when political violence is at issue. In sum, although Rahm has no criminal history, a period of incarceration consistent with the sentencing guidelines is appropriate here.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have

13

is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Though Rahm has no prior criminal history, such a mitigating factor does not outweigh the importance of specific deterrence in this case given the political violence on January 6. Rahm maintains his presence on January 6 was because he was accompanying his father and he hoped to record video to later sell, but that stands in contrast to his statement on the Upper West Terrace of "Oh, my fucking God. We just stormed the Capitol" and that he continued to do so even after filming a wounded police officer. The Court must sentence Rahm in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Court must sentence Rahm based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Rahm has pleaded guilty to Count Three of the Second Superseding Indictment, charging him with Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

This Court sentenced Ryan Kelley to 60 days' incarceration and 12 months' supervised release on a plea to 18 U.S.C. § 1752(a)(1). *United States v. Kelley,* 22-cr-222 (CRC). Like Rahm, Kelley breached the scaffolding adjacent to the Northwest Stairs, ignored warning signs to leave the Capitol grounds such as flashbang grenades and chemical irritants, took photos and videos of the chaos and spent almost two hours on restricted grounds. *Id.,* ECF No. 47 at 2. However, there is no evidence Kelley entered the Capitol building, invaded then-Speaker Pelosi's office suite, or smoked marijuana in the Capitol, all things Rahm did do on January 6.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious because invading the office of a member of Congress represents a show of intimidation, an attempted display of power, above and beyond entering the building. Speaker Pelosi's office was labeled as such until the sign was torn down by a rioter. Even then, it was clearly recognizable as a private office, and thus implicates similar concerns.

Another defendant who entered an office space, Charles Pham, received a sentence of 45 days' imprisonment. *United States v. Charles Pham,* No. 21-cr-109 (TJK). While Pham was an active-duty police officer who downplayed his conduct to the FBI, other facts of his case resemble Rahm's: he saw confrontations between rioters and police before entering, he yelled "we're taking the house back!" and he was inside the building for approximately 20 minutes. Gov. Sentencing Mem., *Pham*, ECF No. 36, at 2.

16

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Rahm must pay $500 in restitution, which reflects in part the role Rahm played in the riot on January 6.[6] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Rahm's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 96.

### VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence James Douglas Rahm, III to four months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Rahm's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

           Respectfully submitted,

           MATTHEW M. GRAVES
           United States Attorney
           D.C. Bar No. 481052

By:    s/ *Douglas G. Collyer*
           Assistant United States Attorney
           Capitol Riot Detailee
           NDNY Bar No.: 519096
           14 Durkee Street, Suite 340
           Plattsburgh, NY 12901
           (518) 314-7800
           Douglas.Collyer@usdoj.gov